**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 20-20634-CIV-ALTONAGA/Goodman**

**GRAPE STARS INTERNATIONAL, INC.,**

      Plaintiff,

v.

**NVENTIVE, INC.**; *et al.*,

      Defendants.

_____/

**<u>ORDER</u>**

**THIS CAUSE** came before the Court on Defendants, nVentive, Inc. and François Tanguay's Renewed[1] Motion to Dismiss [ECF No. 29], filed on May 26, 2020.  Plaintiff, Grape Stars International, Inc., filed a Response in Opposition [ECF No. 35] to the Motion; to which Defendants filed a Reply [ECF No. 38].  On July 27, 2020, the parties filed supplemental briefing on the issue of *forum non conveniens*.  (*See* Pl.'s Suppl. Br. [ECF No. 42]; Defs.' Suppl. Mem. [ECF No. 43]).  The Court has carefully considered the Complaint [ECF No. 1], the parties' written submissions, the record, and applicable law.

**I.     BACKGROUND**

**A.     Plaintiff's Complaint**

This dispute arises out of a business relationship between the parties for the development of a mobile application (the "App").  (*See generally* Compl.).  Plaintiff is a Delaware corporation with its principal place of business in Miami-Dade County, Florida.  (*See id.* ¶ 1).  Defendant, nVentive, Inc., is a Canadian corporation; and Defendant, François Tanguay, is a citizen of Canada.

---

[1] The Court denied Defendants' initial Motion to Dismiss without prejudice after Plaintiff notified the Court of its intention to propound jurisdictional discovery.  (*See* Apr. 13, 2020 Order [ECF No. 26]).

(*See id.* ¶¶ 2, 5).   According to Plaintiff, "Defendant nVentive is an *alter ego* of Defendant Tanguay."[2]   (*Id.* ¶ 4).

Plaintiff is "a third-party marketing business for retailers and distributors of certain consumer products."   (*Id.* ¶ 10).   Plaintiff sought to fund the development of an app to serve as the platform for Plaintiff's customers — retailers and distributors — to sell their consumer products. (*See id.* ¶ 13).   Defendants are in the business of developing and producing apps according to customer specifications.   (*See id.* ¶ 14).

Plaintiff attaches two contracts to the Complaint: a Non-Disclosure and Non-Circumvent Agreement ("NDNC Agreement") [ECF No. 1-1] and an Advisory Board Member Consulting Agreement ("AB Agreement") [ECF No. 1-2].   On January 18, 2016, an entity called Grape Stars Corporation and nVentive entered into the NDNC Agreement "so that they could discuss and Defendant Tanguay could advise concerning building the App."   (Compl. ¶ 16).   Thereafter, Defendants "learned of [Plaintiff's] business plan, models[,] and formulae, and that it was working on funding and developing the App."   (*Id.* ¶ 17 (alterations added)).

Defendants represented they could develop the App according to Plaintiff's specifications, including using a specific technology platform "upon which the App was to be based and with which the App must have been functionally compatible . . . ."   (*Id.* ¶ 18 (alteration added)). Defendants "made various material representations regarding their background, experience and expertise, abilities, and the abilities of the in-house staff[.]"   (*Id.* ¶ 19 (alteration added)).   Tanguay "represented himself as a prospect for a position on [Plaintiff's] Advisory Board based on his reputation, experience[,] and expertise, and on the advice he had been giving [Plaintiff] under the NDNC Agreement."   (*Id.* ¶ 20 (alterations added)).

---

[2] Tanguay is the president of nVentive.   (*See* Decl. of François Tanguay ("Tanguay Decl.") [ECF No. 29-1] ¶ 2).

Relying on these and other representations, Plaintiff "entered into business relationships with Defendants." (*Id.* ¶ 21). The NDNC Agreement was assigned to Plaintiff upon its formation in October 2017. (*See id.* ¶ 22). On March 30, 2018, Plaintiff and Tanguay entered into the AB Agreement. (*See id.* ¶ 23).

According to Plaintiff, "Defendants' representations . . . were materially false in many respects[;]" specifically "as to their abilities, experience, and reputation" and "their promises to build the App on the proper technology platform." (*Id.* ¶ 25 (alterations added)). Defendants "engaged in an unlawful scheme to lure [Plaintiff] under false pretenses into business relationships with Defendants through which Defendants would improperly attempt to steal [Plaintiff's] confidential information, business associates, investors, potential investors, and business plan, models[,] and formulae, as well as to acquire or attempt to improperly acquire the company or a substantial percentage of ownership, and/or to acquire or misdirect the company's money and opportunities." (*Id.* ¶ 26 (alterations added)). Defendants "knowingly ma[de] false and defamatory statements to investors, potential investors, and third parties about [Plaintiff] and its personnel" in order "to re-direct and gain access to [Plaintiff's] investors, potential investors, and others for Defendants' improper gain." (*Id.* ¶¶ 27–28 (alterations added)).

Plaintiff brings eleven claims: violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. sections 1831 *et seq.*, against Defendants (Count I) (*see* Compl. ¶¶ 30–32, 62–79);[3] breach of the NDNC Agreement against Defendants (Count II) (*see id.* ¶¶ 33–53); breach of the AB Agreement against Tanguay (Count III) (*see id.* ¶¶ 54–72);[4] breach of fiduciary duty against

---

[3] The Complaint's paragraphs are mis-numbered. For clarity, the Court will also refer to page numbers when citing to paragraph numbers that are duplicative. The allegations in Count I are found on pages 5–8 of the Complaint and skip from paragraphs 30–32 to paragraphs 62–79.

[4] (*See* Compl. 11–13).

Tanguay (Count IV) (*see id.* ¶¶ 73–85);[5] tortious interference against Defendants (Count V) (*see id.* ¶¶ 86–96); breach of the implied covenant of good faith and fair dealing against Defendants (Count VI) (*see id.* ¶¶ 97–108); misappropriation of trade secretions in violation of the Florida Uniform Trade Secrets Act ("FUTSA"), sections 688.001–688.009, Florida Statutes, against Defendants (Count VII) (*see* Compl. ¶¶ 109–20); fraudulent inducement against Defendants (Count VIII) (*see id.* ¶¶ 121–27); negligent misrepresentation against Defendants (Count IX) (*see id.* ¶¶ 128–33); unfair competition against Defendants (Count X) (*see id.* ¶¶ 134–49); and defamation against Defendants (Count XI)[6] (*see id.* ¶¶ 150–53).

## B.    The Parties' Contracts

According to Defendants, this lawsuit is subject to forum-selection clauses found in two other contracts between the parties — a Master Services Agreement ("MSA") and Subscription Agreement — which "designat[e] Quebec as the sole forum for any dispute." (Mot. 1 (alteration added); *see also id.* 4). Defendants attach these agreements to their Motion along with the Tanguay Declaration. (*See* Tanguay Decl. 8–79).[7] The Court sets forth the relevant provisions of the four agreements the parties primarily discuss.

### 1.    NDNC Agreement

Grape Stars Corporation and nVentive entered into the NDNC Agreement on January 18, 2016. (*See* NDNC Agreement 1). As noted, the NDNC Agreement was assigned to Plaintiff upon its formation in October 2017. (*See* Compl. ¶ 22). The stated purpose of the NDNC Agreement

---

[5] (*See* Compl. 13–15).

[6] The last two claims are both titled Count X. For clarity, the Court refers to the defamation claim as Count XI.

[7] The Court relies on the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

is as follows:

> The [p]arties wish to work together in the creation of mobile applications, more specifically the technology of producing and selling celebrity wines . . . (the "Opportunity"), and in connection with the Opportunity, each [p]arty may disclose to the other confidential technical and business information that the disclosing [p]arty desires the receiving party to treat as confidential.

(NDNC Agreement 1 (alterations added)). "Confidential Information" is defined as

> any information disclosed by either [p]arty to the other [p]arty, . . . including, without limitation, business plans, customer data, customer lists, customer names, designs documents, drawings, engineering information, financial analysis, forecasts, formulas, know-how, ideas, inventions, market information, marketing plans, processes, products, product plans, research, specifications, trade secrets or any other information which is designated as "confidential," "proprietary," or some similar designation . . . [and] certain financial information related to the [c]ompany.

(*Id.* (alterations added; emphasis and quotation marks omitted)).

In a section titled "Non Circumvention[,]" the NDNC Agreement prohibits the parties from "solicit[ing]" or "accept[ing] any business in any manner from sources made available through this [A]greement, without the express permission of the [p]arty who made available the source[.]" (*Id.* 1 (alterations added; emphasis omitted)). This section mandates "complete confidentiality regarding [the parties'] business sources and/or their [a]ffiliates" and requires "disclos[ure] [of] such business sources only to named parties pursuant to the express written permission of the [p]arty who made available the source[.]" (*Id.* (alterations added)). The parties are also prohibited from "enter[ing] into any direct negotiations or transactions with [] contacts revealed by the other [p]arty, unless it can be shown that a prior relationship existed[,]" or "enter[ing] into business transactions with [a]ffiliates provided by the other [p]arty, unless written permission has been obtained from the other [p]arty to do so, unless it can be shown that a prior relationship existed with said party(ies)." (*Id.* 2 (alterations added)).

The NDNC Agreement also provides "[t]he parties agree not to circumvent, nor to attempt

to circumvent the other [p]arty with reference to Confidential Information[,]" and "[t]he [p]arties will not disclose to third parties, and not use for themselves for any purpose outside of the scope of the Agreement, any Confidential Information disclosed to [them] by either [p]arty." (*Id.* 2–3 (alterations added; emphasis omitted)).

The NDNC Agreement states "[n]othing in this Agreement shall obligate either [p]arty to proceed with any transaction between them, and each [p]arty reserves the right, in its sole discretion, to terminate the discussions contemplated by this Agreement concerning the Opportunity." (*Id.* 2 (alterations added)).

Finally, the NDNC Agreement is "governed by and construed in all respects in accordance with the laws of the State of Florida[,]" but it does not contain a forum-selection clause. (*Id.* (alteration added)).

## 2.   AB Agreement

Plaintiff and Tanguay entered into the AB Agreement on March 30, 2018. (*See* AB Agreement 1). Defining Plaintiff as "the 'Company'" and Tanguay as "the 'Advisor[,]'" the AB Agreement provides "Company wishes to engage the services of Advisor, as a member of its Advisory Board, to provide the services set forth below, and Advisor wishes to provide such services." (*Id.* (alteration added; emphasis omitted)). A section titled "Advisor Services" states "Advisor shall act as consulting Chief Technology Officer (CTO) advising services to Company (the 'Services') as a member of its Advisory Board[.]" (*Id.* (alteration added; emphasis omitted)). The Services include, among other things, "[o]verseeing all technology for the [A]pp, web site or any other platform" and "[a]dvis[ing] Company on all technology strategies for Company." (*Id.* (alterations added)).

A "Confidentiality" section mandates "[a]ll inventions, ideas and discoveries, which shall

become Company's property . . . shall be held secret and confidential by Advisor." (*Id.* 2 (alterations added; emphasis omitted)). Moreover,

> Advisor will not use or disclose or allow anyone else to use or disclose to any third party any "Confidential Information" . . . relating to Company, its products, its research and development, its supplies or customers and the Services to be provided hereunder except as may be necessary in the performance of the Services or as may be authorized in writing in advance by an appropriate officer of Company.

(*Id.* (alteration added)). "Confidential Information" is defined to include

> any trade secrets, confidential information, knowledge, data or other information of Company relating to products, processes, know-how, designs, formulas, test data, customer lists, business plans, marketing plans and strategies, pricing strategies or other subject matter pertaining to any business of Company or any clients, customers, consultants, licensees or affiliates.

(*Id.* (quotation marks omitted)).

Like the NDNC Agreement, the AB Agreement is "governed by and construed in accordance with the laws of the State of Florida" and does not contain a forum-selection clause.[8] (*Id.* 3).

### 3.    MSA

On March 30, 2018, Plaintiff and nVentive also entered into the MSA and an accompanying Statement of Work ("SOW") for the development of the App. (*See* Tanguay Decl., Ex. B, MSA 11–24; *id.*, SOW 25–38; Mot. 4). The MSA provides that the parties "wish to enter into this Master Agreement to set out the terms and conditions under which nVentive shall perform certain [s]ervices . . . on an independent contractor basis[] for [Plaintiff]." (MSA 12 (alterations added; capitalization altered; emphasis and quotation marks omitted)). The MSA further states

---

[8] Defendants note the parties executed a Stock Option Plan granting Tanguay the option to purchase 200 of Plaintiff's shares as compensation under the AB Agreement. (*See* Mot. 5; *see also* Tanguay Decl., Ex. E, Stock Option Plan 64–79). The Stock Option Plan "is governed by the laws of the Province of Quebec, and the rights of all parties and the construction and effect of each provision of the Plan shall be according to the laws of the Province of Quebec without giving effect to the conflict of laws principles of such jurisdiction." (Stock Option Plan 76).

"nVentive represents and warrants to, and covenants with [Plaintiff] that . . . nVentive and [its] [e]mployees have the necessary knowledge, experience and skills to perform the [s]ervices set out in each and every [s]tatement of [w]ork." (*Id.* 15 (alterations added; capitalization altered)). The SOW is governed by the terms of the MSA and sets forth the desired services, providing that "nVentive will design and develop the transactional IOS/Android mobile application for [Plaintiff]." (SOW 29 (capitalization altered)).

The MSA requires a "[r]eceiving [p]arty" to "maintain the confidentiality of all Confidential Information of a [d]isclosing [p]arty and [] not release, disclose, divulge, sell or distribute any Confidential Information, without prior written consent of the [d]isclosing [p]arty." (MSA 20 (alterations added)). Further, "[t]he [r]eceiving [p]arty may only use and copy the [d]isclosing [p]arty's Confidential Information as is necessary to carry out its activities contemplated by this MSA and for no other purpose." (*Id.* (alterations added)). "Confidential Information" is defined as

> any and all material and/or information of a [disclosing party], any of its [a]ffiliates, or third [p]arties to which the [d]isclosing [p]arty has an obligation of confidentiality, which has or will come into the possession or knowledge of the [receiving party] in connection with or as a result of entering into this MSA, including information about past, present or future business, finances, forecast, clients, suppliers, technologies, and includes specifically, as the case may be, source code of any software defined as [p]re-[e]xisting [w]ork.

(*Id.* 13 (alterations added; emphasis and quotation marks omitted)).

The MSA contains a choice-of-law and forum-selection clause providing

> [t]his MSA shall be governed by and interpreted in accordance with the laws of the province of Quebec, excluding rules of private international law that lead to the application of the laws of any other jurisdiction. The courts of Montreal shall have the exclusive jurisdiction to hear any matter arising in connection with this MSA. The [p]arties hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising [sic] or relating to this MSA.

(*Id.* 23 (alterations added)).

4.      **Subscription Agreement**

Finally, Plaintiff and nVentive entered into a Subscription Agreement on April 4, 2018.

(*See* Tanguay Decl., Ex. C, Subscription Agreement 39–59).   Regarding fees and payment for

nVentive's services, the SOW provides in part that Plaintiff "will issue equity to nVentive in the

form of an option for 200 shares at a $1.25MM valuation in addition to 500 founders shares."

(SOW 36 (capitalization altered)).   In accordance with that provision, the parties executed the

Subscription Agreement as to the shares.  (*See* Mot. 4).

Like the MSA, the Subscription Agreement contains a choice-of-law and forum-selection

clause, which provides

> [t]his Agreement will be governed by and construed in accordance with the laws of
> the Province of Quebec, excluding its conflicts of laws principles.   You hereby
> irrevocably consent to the exclusive jurisdiction of the courts of the Province of
> Quebec in connection with any matter arising under this Agreement.

(Subscription Agreement 50 (alteration added)).

**C.      Defendants' Motion**

Defendants move to dismiss the Complaint (1) based on the forum-selection clauses in the

MSA and Subscription Agreement and the doctrine of *forum non conveniens*; (2) for improper

venue; (3) for lack of personal jurisdiction; and (4) for failure to state a claim for relief.  (*See*

*generally* Mot.).  Because the Court finds the MSA's forum-selection clause[9] applies to this dispute

and grants Defendants' Motion based on *forum non conveniens*, the Court declines to address

Defendants' remaining arguments.[10]

---

[9] The Court concludes Plaintiff's claims arise under the MSA, the central document of the parties' business
relationship, and therefore does not address whether the Subscription Agreement's forum-selection clause
also applies.

[10] "Under appropriate conditions, a court should consider dismissal on *forum non conveniens* grounds
without first determining whether personal jurisdiction is proper . . . ."  *McCoy v. Sandals Resorts Int'l,
Ltd.*, No. 19-cv-22462, 2019 WL 3531523, at *1 (S.D. Fla. Aug. 2, 2019) (alteration added).  "As the

## II.  STANDARD

A motion to dismiss based on the applicability of a forum-selection clause requiring the

parties to litigate in a foreign country is properly analyzed "through the doctrine of *forum non*

*conveniens*." *Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 60

(2013).  "The doctrine of *forum non conveniens* permits a court with venue to decline to exercise

its jurisdiction when the parties' and court's own convenience, as well as the relevant public and

private interests, indicate that the action should be tried in a different forum." *Pierre-Louis v.*

*Newvac Corp.*, 584 F.3d 1052, 1056 (11th Cir. 2009) (italicization added).  In general, to obtain

dismissal on the ground of *forum non conveniens*, a defendant must show:

> (i) that an adequate alternative forum is available, (ii) that relevant public and
> private interests weigh in favor of dismissal, and (iii) that the plaintiff can reinstate
> his suit in the alternative forum without undue inconvenience or prejudice.
> Pertinent private interests of the litigants include relative ease of access to evidence
> in the competing fora, availability of witnesses and compulsory process over them,
> the cost of obtaining evidence, and the enforceability of a judgment.  Relevant
> public interests include the familiarity of the court(s) with the governing law, the
> interest of any foreign nation in having the dispute litigated in its own courts, and
> the value of having local controversies litigated locally.

*Id.* (quoting *Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1356–

57 (11th Cir. 2008)).

"The calculus changes, however, when the parties' contract contains a valid forum-

selection clause, which represents the parties' agreement as to the most proper forum." *Atl. Marine*

*Constr. Co.*, 571 U.S. at 63 (quotation marks and citation omitted).  Because a valid forum-

selection clause "protects [the parties'] legitimate expectations and furthers vital interests of the

---

Supreme Court explained[,] . . . where subject-matter or personal jurisdiction is difficult to determine, and
*forum non conveniens* considerations weigh heavily in favor of dismissal, the court properly takes the less
burdensome course."  *Id.* at *1–2 (alterations added; quoting *Sinochem Int'l Co. v. Malaysia Int'l Shipping*
*Corp.*, 549 U.S. 422, 436 (2007); other citation omitted)).

justice system[,]" it should be "given controlling weight in all but the most exceptional cases." *Id.* (alterations added; quotation marks and citations omitted).

The presence of a valid forum-selection clause requires the district court to adjust its *forum non conveniens* analysis in three ways. *See id.* First, "the plaintiff's choice of forum merits no weight. Rather, as the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." *Id.* Second, the district court should only consider the public-interest factors, as the parties "waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." *Id.* at 64. Third, "when a party bound by a forum-selection clause files suit in a different forum than the one pre-selected, the plaintiff's chosen venue's choice-of-law rules will not apply." *Vanderham v. Brookfield Asset Mgmt., Inc.*, 102 F. Supp. 3d 1315, 1319 (S.D. Fla. 2015) (citing *Atl. Marine Constr. Co.*, 571 U.S. at 64).

## III.   DISCUSSION

Defendants argue the MSA's forum-selection clause is enforceable and applies to all of Plaintiff's claims, and consequently, under the modified *forum non conveniens* analysis, the case should be dismissed. (*See* Mot. 6–12).

## A.   Enforceability and Applicability of the Forum-Selection Clause

The MSA's forum-selection clause is enforceable and mandatory. (*See id.* 6–8). "Forum-selection clauses are presumptively valid and enforceable unless the plaintiff makes a 'strong showing' that enforcement would be unfair or unreasonable under the circumstances." *Krenkel v. Kerzner Int'l Hotels Ltd.*, 579 F.3d 1279, 1281 (11th Cir. 2009) (citing *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593–95 (1991); and *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 10 (1972)). Plaintiff does not challenge the forum-selection clause on this basis. (*See generally*

Resp.).  And the clause is mandatory because it "dictates an exclusive forum for litigation under the contract." *Glob. Satellite Commc'n Co. v. Starmill U.K. Ltd.*, 378 F.3d 1269, 1272 (11th Cir. 2004) (quotation marks and citation omitted); (*see also* MSA 23 ("The courts of Montreal shall have the *exclusive* jurisdiction to hear any matter arising in connection with this MSA." (emphasis added))).

The parties' arguments center on whether the forum-selection clause applies to Plaintiff's claims.  As stated, the MSA's forum-selection clause provides "[t]he courts of Montreal shall have the exclusive jurisdiction to hear any matter *arising in connection with this MSA*."  (MSA 23 (alteration and emphasis added)).

"In this circuit, forum selection clauses are broadly construed to effectuate an orderly and efficient resolution of all claims arising between the parties to a contract and to promote enforcement of those clauses consistent with the parties' intent." *Pods, Inc. v. Paysource, Inc.*, No. 8:05-cv-1764, 2006 WL 1382099, at *2 (M.D. Fla. May 19, 2006) (citing *Stewart Org., Inc. v. Ricoh Corp.*, 810 F.2d 1066, 1070 (11th Cir. 1987)).  "[F]orum selection clauses are to be interpreted by reference to 'ordinary contract principles.'" *Cornett v. Carrithers*, 465 F. App'x 841, 842 (11th Cir. 2012) (alteration added; quoting *Snapper, Inc. v. Redan*, 171 F.3d 1249, 1261 (11th Cir. 1999)).  "[T]he plain meaning of a contract's language governs its interpretation[;]" and "[t]he court must look at the contract as a whole, the parties, and the purpose of the agreement to best determine the intent of the parties in interpreting the agreement." *Slater v. Energy Servs. Grp. Int'l, Inc.*, 634 F.3d 1326, 1330 (11th Cir. 2011) (alterations added; citations and footnote call number omitted).

Where, as here, "a clause refers to claims or actions 'arising under or in connection with' the contract, the clause is taken to include 'all causes of action arising directly or indirectly from

12

the business relationship evidenced by the contract.'" *McCoy v. Sandals Resorts Int'l, Ltd.*, No. 19-cv-22462, 2019 WL 6130444, at *11 (S.D. Fla. Nov. 19, 2019) (emphasis omitted; quoting *Stewart Org., Inc.*, 810 F.2d at 1070). This includes statutory and tort claims, not just contractual claims directly relating to the contract. *See Stiles v. Bankers Healthcare Grp., Inc.*, 637 F. App'x 556, 560 (11th Cir. 2016) (citations omitted). When there is more than one contract between the parties, "the Eleventh Circuit has indicated a claim is more likely to be related to a contract when that contract is the central document in the parties' relationship." *Espie v. Wash. Nat'l Ins. Co.*, No. 2:14cv6, 2014 WL 2921022, at *6 (M.D. Ala. June 27, 2014) (quotation marks omitted; quoting *Int'l Underwriters AG v. Triple I: Int'l Investments, Inc.*, 533 F.3d 1342, 1347 (11th Cir. 2008)).

Defendants argue Plaintiff's claims "all arise from the App's development[,] which is the subject matter of the MSA" (Mot. 8 (alteration added)), pointing to Plaintiff's allegations that "Defendants failed to develop the App, misused confidential information gained in working on the App, or misrepresented their expertise in developing the App" (*id.* 3–4). Plaintiff disagrees, stating "the focus of the Complaint is not on the development of the App, but rather the improper use of confidential information provided to Defendants under both the NDNC Agreement and the AB Agreement[]" (Resp. 4 (alteration added)); and the claims therefore do not arise out of the MSA and are not subject to its forum-selection clause (*see id.* 7). Plaintiff's attempt to cabin its claims in this way fails.

Plaintiff's claims do fall under the scope of the MSA's forum-selection clause. The MSA "set[s] out the terms and conditions under which nVentive shall perform certain [s]ervices" for Plaintiff (MSA 12 (alterations added; capitalization altered)), namely the "design and develop[ment] [of] the transactional IOS/Android mobile application" (SOW 29 (alterations

added)).  The MSA thus embodies the parties' business relationship for the development of the App.

At bottom, Plaintiff's claims concern a purported "scheme to lure [Plaintiff] under false pretenses into business relationships with Defendants through which Defendants would improperly attempt to steal [Plaintiff's] confidential information . . . as well as to acquire or attempt to improperly acquire the company or a substantial percentage of ownership, and/or to acquire or misdirect the company's money and opportunities."  (Compl. ¶ 26 (alterations added)).  Plaintiff alleges Defendants gained Plaintiff's trade secrets and other confidential information via the parties' contractual relationship for advisory services related to development of the App.  (*See id.* ¶¶ 16–17, 70,[11] 38, 55, 80–81, 90, 102, 111, 138).  Defendants allegedly misused that information by usurping Plaintiff's business opportunities and creating an app that would compete with Plaintiff's App.  (*See id.* ¶¶ 72–73,[12] 41, 43, 59–60, 93, 98, 113–14, 139, 148).  Defendants, as part of this scheme, allegedly misrepresented that they would build the App on the proper technology platform with the intention of inducing Plaintiff to contract with them and misusing Plaintiff's confidential information (*see id.* ¶¶ 25–26, 124, 126, 128); defamed Plaintiff and its personnel to investors, potential investors, and other third parties who were interested in the App in order to establish relationships with those parties (*see id.* ¶¶ 27–28, 151); and failed to complete development of Plaintiff's App to limit competition with Defendants' competing app and business (*see id.* ¶¶ 44, 107, 142).

Considering these allegations, the claims stated in the Complaint plainly "aris[e] directly or indirectly from the business relationship evidenced by the [MSA]" for the App's development.

---

[11] (*See* Compl. 7).

[12] (*See id.*).

14

*McCoy*, 2019 WL 6130444, at *11 (alterations added; quotation marks, citation, and emphasis omitted). Eight of Plaintiff's claims concern Defendants' alleged disclosure and misappropriation of Plaintiff's confidential information gained in advising Plaintiff on the App: violation of the DTSA (Count I), breach of the NDNC Agreement (Count II), breach of the AB Agreement (Count III), breach of fiduciary duty (Count IV), tortious interference (Count V), breach of the implied covenant of good faith and fair dealing (Count VI), misappropriation of trade secrets under the FUTSA (Count VII), and unfair competition (Count X). Plaintiff's fraudulent inducement and negligent misrepresentation claims (Counts VIII and IX) arise from Defendants' purported misrepresentations that induced Plaintiff to enter into App-related contracts with them, under the protection of which Plaintiff disclosed its confidential information. And Plaintiff's defamation claim (Count XI) alleges Defendants made false statements to third parties who were interested in the App in order to usurp Plaintiff's opportunities with those parties.[13]

Plaintiff maintains its claims arise under the NDNC and AB Agreements because the claims relate to the misuse of confidential information disclosed under the protection of those agreements. (*See* Resp. 4–7; Pl.'s Suppl. Br. 4–6). According to Plaintiff, the MSA had an

---

[13] Counts III and IV are against Tanguay only, while the remaining claims are against both Defendants. Defendants are correct that Tanguay is bound by the forum-selection clause even though he is not a signatory to the MSA. (*See* Mot. 10–11).

"In order to bind a non-party to a forum selection clause, the party must be closely related to the dispute such that it becomes foreseeable that it will be bound." *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1299 (11th Cir. 1998) (quotation marks and citations omitted). Tanguay is central to the contractual relationship between the parties; he is nVentive's president (*see* Tanguay Decl. ¶ 2) and signed the MSA on behalf of nVentive (*see* MSA 24). Indeed, Plaintiff alleges "Defendant nVentive is an *alter ego* of Defendant Tanguay" (Compl. ¶ 4), and most of Plaintiff's allegations refer to both Defendants together (*see generally id.*). The MSA's forum-selection clause thus covers the claims asserted against Tanguay. *See Tradex Glob. Master Fund SPC Ltd v. Palm Beach Capital Mgmt. LLC*, No. 09-21622-Civ, 2009 WL 10644816, at *3 (S.D. Fla. Dec. 4, 2009), *report and recommendation adopted*, 2010 WL 11442204 (S.D. Fla. Mar. 1, 2010) ("[O]fficers of a corporate signatory can satisfy the closely-related test." (alteration added)); *Gonzalez v. Watermark Realty Inc.*, No. 09-60265-Civ, 2010 WL 1299740, at *4 (S.D. Fla. Mar. 30, 2010) (finding the defendant was bound by the forum-selection clause in an agreement she signed on behalf of a signatory because she was integral to the transaction reflected by the agreement).

"entirely separate purpose[]" — the MSA was for creating the App, while the NDNC and AB Agreements were specifically for advising Plaintiff on its business decisions (Pl.'s Suppl. Br. 3 (alteration added)) — and Plaintiff's Complaint therefore does not arise out of the MSA (*see* Resp. 7). Again, Plaintiff's argument fails to persuade.

Plaintiff insists "[t]he business relationships in each of the agreements varies greatly[,]" explaining that "[t]he NDNC [Agreement] was for the parties to exchange confidential information concerning Plaintiff's business prior to going live to the public at large; the AB Agreement [wa]s for governing Tanguay's position on Plaintiff's advisory board; [and] the MSA was for the development of a specific mobile application[.]" (Pl.'s Suppl. Br. 5 (alterations added)). Plaintiff's contentions are belied by the language of the contracts and Plaintiff's own allegations.

The NDNC Agreement protects confidential information the parties intended to disclose in light of a potential relationship for the development of an app. (*See* Compl. ¶ 16 ("Defendants entered into [the NDNC Agreement] so that they could discuss and Defendant Tanguay could advise concerning building the App." (alteration added)); NDNC Agreement 1 ("The [p]arties wish to work together in the creation of mobile applications . . . (the 'Opportunity'), and in connection with the Opportunity, each [p]arty may disclose to the other confidential technical and business information[.]" (alterations added))). The AB Agreement was executed on the same day as the MSA and SOW and provides for Tanguay's supervision of "all technology for the [A]pp" and "[a]dvi[ce] [] on all technology strategies[.]" (AB Agreement 1 (alterations added); *see also* Compl. ¶ 76 ("As an Advisory Board [m]ember, Defendant Tanguay would advise [Plaintiff] on the most central and critical part of [Plaintiff's] business — the App[.]" (alterations added))). The NDNC and AB Agreements are thus part of the parties' business relationship for the App's development.

16

And because the MSA is "the central document in the parties' relationship[,]" its forum-selection clause is "more likely" to cover Plaintiff's claims, even if the Complaint invokes the NDNC and AB Agreements' protection of confidential information.[14]  *Espie*, 2014 WL 2921022, at *6 (quotation marks and citation omitted); *see also id.* (finding a forum-selection clause in a "Sales Representative Agreement" authorizing the plaintiff to sell the defendant's insurance applied to the plaintiff's claims even though the claims "relate[d] most directly to a subsequent agreement" modifying certain compensation provisions); *Blue Ocean Corals, LLC v. Phoenix Kiosk, Inc.*, No. 14-Civ-61550, 2014 WL 4681006, at *8 (S.D. Fla. Sept. 19, 2014) (concluding forum-selection clauses in two Terms and Conditions covered the plaintiff's claims that related to an earlier Confidentiality Agreement because the Terms and Conditions constituted "the central documents in the relationship pursuant to which [the] [p]laintiff is suing [the] [d]efendants in this action" (alterations added)).

That the causes of action are arguably more closely related to the NDNC and AB Agreements does not mandate a different conclusion.  *See Espie*, 2014 WL 2921022, at *4 ("[The plaintiff's] argument, that the fact that [it] is suing under a different contract than the one which contains the forum-selection clause means the clause does not apply, is [] simplistic and unpersuasive." (alterations added; footnote call number omitted)).  On this point, *Blue Ocean Corals* is instructive.

---

[14] Defendants note (*see* Mot. 5) the MSA also contains a provision for the protection of confidential information and prohibits the improper use of that information (*see* MSA 20 ("A [r]eceiving [p]arty shall maintain the confidentiality of all Confidential Information of a [d]isclosing [p]arty and shall not release, disclose, divulge, sell or distribute any Confidential Information, without the prior written consent of the [d]isclosing [p]arty.  The [r]eceiving [p]arty may only use and copy the [d]isclosing [p]arty's Confidential Information as is necessary to carry out its activities contemplated by this MSA and for no other purpose." (alterations added))).

The dispute in *Blue Ocean Corals* arose out of a contractual relationship between the parties.  *See* 2014 WL 4681006, at *1.  In December 2012, the plaintiff and one of the defendants entered into a Confidentiality Agreement "to restrict the use and disclosure of confidential information exchanged in discussions towards 'the establishment of a possible business relationship between the parties[.]'"  *Id.* (alteration added)).  Several months later, another defendant — a successor entity to the first defendant — contracted with the plaintiff for certain services.  *See id.*  The parties' relationship was governed by several documents, including purchase orders, sales orders, and two Terms and Conditions containing identical forum-selection clauses.  *See id.* at *1–2.  The plaintiff sued three defendants, all related entities, for claims similar to those asserted here — breach of the purchase orders; fraudulent inducement; breach of the Confidentiality Agreement; violation of the Florida Deceptive and Unfair Trade Practices Act; intentional interference with contractual relations; interference with prospective economic advantage; and violation of the FUTSA.  *See id.* at *2.

The defendants sought to dismiss the case based on *forum non conveniens* given the forum-selection clauses provided "any action arising out of or relating to this [a]greement shall be in the Superior Courts of Arizona located within Maricopa County."  *Id.* (alteration added).  As here, the plaintiff contended the clauses did not encompass all its claims.  *See id.* at *7.  Specifically, the plaintiff "argue[d] that the forum-selection clauses ha[d] no application to the Confidentiality Agreement . . . and consequently to the causes of action derivative of that agreement[,]" which the court construed to "include the breach of contract claim with respect to the Confidentiality Agreement and the FUTSA claim, and perhaps the intentional interference with contractual relations and interference with prospective economic advantage claims as well."  *Id.* (alterations added).

The court rejected the plaintiff's argument and concluded all claims were covered by the forum-selection clauses, noting that "[e]ven if some of the allegations . . . pertain to the disclosure of proprietary and confidential information arguably connected to the Confidentiality Agreement, those allegations also 'arise from' the business relationship evidenced by the Terms and Conditions." *Id.* at *8 (alterations added).  The court emphasized "the Confidentiality Agreement was preliminary and anticipatory" and "pertained to the exchange of confidential information towards 'the establishment of a possible business relationship between the parties[,]'" while the Terms and Conditions were the central documents in the parties' relationship. *Id.* (alteration added).

The same conclusion follows here.  Even if some or all of Plaintiff's claims relating to disclosure and misuse of confidential information are more directly connected to the NDNC and AB Agreements than to the MSA, the claims also arise from the business relationship evidenced by the MSA.  In particular, the NDNC Agreement was meant to be "preliminary and anticipatory." It provided "each [p]arty may disclose to the other confidential technical and business information" in anticipation of a potential business relationship for "the creation of mobile applications . . . (the 'Opportunity')[;]" did not "obligate either [p]arty to proceed with any transaction between them[;]" and gave each party "the right, in its sole discretion, to terminate the discussions contemplated by this Agreement concerning the Opportunity."  (NDNC Agreement 1–2 (alterations added)).

By contrast, the MSA, like the Terms and Conditions in *Blue Ocean Corals*, is the central document in the parties' business relationship: it "set[s] out the terms and conditions" (MSA 12 (alteration added)) for the "design and develop[ment] [of] the transactional IOS/Android mobile application for [Plaintiff]" (SOW 29 (alterations added)).  Mindful that the forum-selection clause

should be "broadly construed to effectuate an orderly and efficient resolution of all claims arising between the parties[,]" *Pods, Inc.*, 2006 WL 1382099, at \*2 (alteration added; citation omitted), the Court concludes Plaintiff's claims "aris[e] in connection with th[e] MSA" and therefore fall under the scope of the MSA's forum-selection clause (MSA 23 (alterations added)).[15]

## B.   Modified *Forum Non Conveniens* Analysis

Because a valid forum-selection clause applies to Plaintiff's claims, the Court will not consider the parties' private interests in evaluating the Motion. *See Atl. Marine Constr. Co.*, 571 U.S. at 64. Under the modified *forum non conveniens* analysis, the Court assesses (1) whether an adequate alternative forum is available, (2) whether the public-interest factors weigh in favor of dismissal, and (3) whether Plaintiff can reinstate its suit in the alternative forum without undue inconvenience or prejudice. *See Jiangsu Hongyuan Pharm. Co. v. DI Glob. Logistics Inc.*, 159 F. Supp. 3d 1316, 1328 (S.D. Fla. 2016) (citing *GDG Acquisitions, LLC v. Gov't of Belize*, 749 F.3d 1024, 1028 (11th Cir. 2014)).

### 1.   Adequacy and Availability of the Courts of Quebec

The defendant "bears the burden of demonstrating" a forum is both available and adequate. *King v. Cessna Aircraft Co.*, 562 F.3d 1374, 1382 (11th Cir. 2009) (per curiam). An available and adequate forum is one in which the court "can assert jurisdiction over the litigation (availability), cognizant that only in rare circumstances will the remedy offered by the other forum be clearly unsatisfactory (adequacy)." *Karl v. Starwood Hotels & Resorts Worldwide, Inc.*, No. 13-24051-Civ, 2014 WL 11906608, at \*2 (S.D. Fla. Feb. 21, 2014) (citing *Aldana v. Del Monte Fresh Produce N.A., Inc.*, 578 F.3d 1283, 1290 (11th Cir. 2009)). "Availability and adequacy warrant

---

[15] Defendants urge the Court to find the MSA, Subscription Agreement, and AB Agreement form one contract because they were executed at or near the same time, and the MSA constituted a novation of the NDNC Agreement. (*See* Mot. 9–11; Reply 3–6; Defs.' Suppl. Mem. 1–4). The Court need not make these determinations to conclude the MSA's forum-selection clause covers Plaintiff's claims.

separate consideration." *Leon v. Millon Air, Inc.*, 251 F.3d 1305, 1311 (11th Cir. 2001) (citation

omitted). Defendants contend Quebec is an adequate and available forum because they "have filed

suit in Quebec[,] and Quebec can provide for litigation of [Plaintiff's] allegations and offer

possible redress to [Plaintiff]." (Mot. 12 (alterations added)).

A forum is generally considered available if the defendant is "amenable to process in the

other jurisdiction." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 n.22 (1981) (quotation marks

and citation omitted). The alternative forum must "possess[] jurisdiction over the whole case,

including all of the parties[.]" *Wilson v. Island Seas Invs., Ltd.*, 590 F.3d 1264, 1269 (11th Cir.

2009) (alterations added; citation omitted).

Tanguay is a citizen and resident of Quebec, nVentive is a Canadian corporation

headquartered in Quebec (*see* Tanguay Decl. ¶ 2), and Defendants have initiated a lawsuit against

Plaintiff there on related issues (*see id.*, Ex. F., Quebec Lawsuit Docs. 80–146). Accordingly,

there is no indication Quebec is not an available forum, particularly where Plaintiff has entirely

failed to address in its written briefing the availability requirement. (*See generally* Resp.); *see also*

*Avia Support Int'l, Inc. v. Acts Aero Tech. Support & Servs., Inc.*, No. 09-21812-Civ, 2010 WL

11505692, at *1, *7 & n.7 (S.D. Fla. Aug. 31, 2010) (noting Quebec courts would have personal

jurisdiction over the defendants, Canadian corporations with their principal places of business in

Quebec, in a suit involving breach-of-contract and related claims); *Logan Int'l Inc. v. 1556311*

*Alberta Ltd.*, 929 F. Supp. 2d 625, 632 (S.D. Tex. 2012) (finding Canada was an available

alternative forum because a party had a related lawsuit pending there and "[t]here [wa]s no

indication that the Canadian [d]efendants would not be subject to personal jurisdiction in the

Canadian lawsuit" (alterations added)).

A forum is adequate if it provides the potential for redress of the plaintiff's injuries. *See*

*King*, 562 F.3d at 1382 (citing *Piper Aircraft Co.*, 454 U.S. at 255 n.22).  It is not necessary for the alternative forum to be "a perfect forum" for it to provide a remedy for the plaintiff.  *Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279, 1283 (11th Cir. 2001).  Further, the plaintiff must offer "evidence" of "partiality or delay . . . typically associated with the adjudication of similar claims" in the alternative forum before the defendant bears the "ultimate burden of persuasion" to prove the forum's availability.  *Leon*, 251 F.3d at 1311–12 (emphasis and alterations added; citation omitted).

Plaintiff has offered no such evidence, and there is nothing to suggest Quebec will provide inadequate relief to Plaintiff.  (*See generally* Resp.); *see also Avia Support Int'l, Inc.*, 2010 WL 11505692, at *13 (finding Quebec "cannot be said to afford remedies that are 'clearly unsatisfactory' or 'amount to no remedy at all'" where the plaintiff failed to rebut the presumption that Quebec was an adequate forum); *McNeil v. Stanley Works*, 33 F. App'x 322, 325 (9th Cir. 2002) ("Canada is not unsuitable . . . simply because the rights and legal protections provided by Canadian law may be less extensive than those afforded by United States law." (alteration added; citation omitted)); *Ledingham v. Parke-Davis Div. of Warner-Lambert Co.*, 628 F. Supp. 1447, 1450 (E.D.N.Y. 1986) ("[A]lthough plaintiff's potential damage award may be smaller in Canada, and although litigation there might be more expensive and more difficult, the [c]ourt finds that there is no danger that plaintiff will be deprived of a remedy or treated unfairly there." (alterations added; citation omitted)).

In sum, Quebec is an available and adequate alternative forum for Plaintiff's claims.

## 2.      Public-Interest Factors

Defendants maintain the public-interest factors weigh in favor of dismissal.  (*See* Mot. 11–12).  As stated, "[t]he relevant public interests include 'the familiarity of the court(s) with the

governing law, the interest of any foreign nation in having the dispute litigated in its own courts, and the value of having local controversies litigated locally.'" *Jiangsu Hongyuan Pharm. Co.*, 159 F. Supp. 3d at 1328 (alteration added; quoting *Pierre-Louis*, 584 F.3d at 1065; other citation omitted).   A court should also consider the administrative difficulties flowing from court congestion, the avoidance of unnecessary problems in conflict of laws or in the application of foreign law, and the unfairness of burdening citizens in an unrelated forum with jury duty.   *See Piper Aircraft Co.*, 454 U.S. at 241 n.6 (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947)).

The Eleventh Circuit "do[es] not require the district court to explicitly consider every . . . public interest factor[,]" especially "when the relevant . . . public factors weigh in favor of dismissal."   *Wylie v. Island Hotel Co. Ltd.*, 774 F. App'x 574, 580 (11th Cir. 2019) (alterations added; citations omitted).   The Court addresses the relevant factors.

***Administrative difficulties flowing from court congestion.***   Both parties acknowledge that while "the Southern District of Florida has one of the busiest dockets in the country," weighing in favor of dismissal, "this factor generally does not warrant significant consideration in the *forum non conveniens* analysis, and the Court does not accord it much weight."[16]   *Gordon v. Sandals*

---

[16] Plaintiff contends Quebec "has significant issues as to the administration of justice on these claims compared to this District[,]" pointing to "the inability to get a jury trial," Quebec courts' delay of commencement of trial "until some two (2) years after the filing of joint declaration that the case is ready for trial[,]" and the current "suspen[sion] for civil non-emergency matters since March 2020" due to COVID-19.   (Pl.'s Suppl. Br. 8 (alterations added)).   But Plaintiff "has not shown that adjudication of the parties' dispute[] would be more expeditious in [Florida] than in [Quebec.]"   *Belacon Pallet Servs., LLC v. Amerifreight, Inc.*, No. 1:15cv191, 2016 WL 8999936, at *6 (N.D. Fla. Mar. 26, 2016) (alterations added).   It bears mentioning jury trials are also suspended in this District due to the COVID-19 pandemic until January 2021.

Furthermore, to the extent Plaintiff intends to assert Quebec is an inadequate forum, Plaintiff's argument fails to persuade.   "[T]he inability to get a jury trial" does not mean Quebec is an inadequate forum (Pl.'s Suppl. Br. 8 (alteration added)), as a forum need not be "perfect" for it to provide a satisfactory remedy, *Satz*, 244 F.3d at 1283; *see also McNeil*, 33 F. App'x at 325 ("Canada is not unsuitable . . . simply because the rights and legal protections provided by Canadian law may be less extensive than those afforded by United States law." (alteration added; citation omitted)).   And Plaintiff's "evidence" of delay is insufficient. As discussed, an alternative forum is presumptively adequate until "the plaintiff produces significant

*Resorts Int'l, Ltd.*, 418 F. Supp. 3d 1132, 1142 (S.D. Fla. 2019) (alterations added); (*see also* Pl.'s

Suppl. Br. 6 n.6; Defs.' Suppl. Mem. 6–7).

>    ***Governing law and the avoidance of unnecessary problems in conflict of laws or in the***

***application of foreign law.*** Defendants assert "[t]he vast majority, if not all, issues in this dispute

are governed by Quebec law[.]" (Mot. 11 (alterations added)).  In a cursory footnote, Defendants

explain "[t]he MSA, SOW, and Subscription Agreement provide Quebec law governs[;]" the

NDNC Agreement — which is governed by Florida law — "is inapplicable" because it was

superseded by the MSA; and the AB Agreement's Florida choice-of-law provision does not apply

because "the Stock Option Plan entered in conjunction with the AB Agreement provides for

Quebec law" and "any ambiguity[] must be construed against [Plaintiff]" since it drafted both

agreements.  (Mot. 11 n.9 (alterations added)).

>    Plaintiff maintains the NDNC and AB Agreements are governed by Florida law, and

Defendants "do not present any reasons why (or how) these agreements should (or could) be

interpreted under the laws of Quebec." (Pl.'s Suppl. Br. 7–8; *see also* Resp. 9 (stating the Stock

Option Plan's Quebec choice-of-law provision does not apply because "[t]here is no cause of

action or material allegation in the Complaint related to the Stock Option Plan" (alteration

added))).  Plaintiff also points out the Complaint includes federal and state statutory claims

---

evidence documenting the partiality or delay (in years) typically associated with the adjudication of similar claims, and these conditions are so severe as to call the adequacy of the forum into doubt[.]" *Leon*, 251 F.3d at 1312 (alteration added).

Plaintiff fails to show the delay is so severe as to render Quebec an inadequate forum, particularly where Plaintiff has not provided evidence of the courts' adjudication of claims similar to those asserted here. *See Banco Latino v. Gomez Lopez*, 17 F. Supp. 2d 1327, 1332 (S.D. Fla. 1998) ("[D]elays of two or three years are of no significance in the forum non conveniens analysis[.]" (alterations added; citing *Bhatnagar v. Surrendra Overseas Ltd.*, 52 F.3d 1220, 1227 (3d Cir. 1995)); *Kyla Shipping Co. v. Shanghai Zhenhua Heavy Indus. Co.*, No. Civ.A. 09-00765, 2012 WL 1565634, at *6 (S.D. Ala. Apr. 30, 2012) (noting "[d]elay is rarely the basis for declaring a forum inadequate" and finding the plaintiff "failed to substantiate its assertion of delay" because of "the lack of specificity regarding the 'similar' cases" (alteration added; citing *Tazoe v. Airbus S.A.S.*, 631 F.3d 1321, 1331 (11th Cir. 2011)))).

requiring the application of U.S. law.  (*See* Resp. 9).

In their Supplemental Memorandum, Defendants acknowledge "what law applies to [Plaintiff's] eleven counts is complicated" and "indisputably th[e] Court would be ensnared in difficult choice of law determinations that are more complicated by the fact that at least some issues would be governed by Quebec law requiring documents and law be translated from French." (Defs.' Suppl. Mem. 7–8 (alterations added)).  Defendants' point is well-taken.

"Choice of law considerations, particularly the application of foreign rules of decision, are an important public factor in considering a motion to dismiss for *forum non conveniens*."  *In re Banco Santander Sec.-Optimal Litig.*, 732 F. Supp. 2d 1305, 1339 (S.D. Fla. 2010) (citing *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1430 (11th Cir. 1996)).  Plaintiff asserts a federal statutory claim; a state statutory claim; three contractual claims; and various tort claims.  (*See generally* Compl.).  If the Court retained the case, the Court would be required to determine what law applies to each of Plaintiff's eleven claims.  And because Plaintiff "file[d] suit in a different forum than the one pre-selected" by the forum-selection clause, it is possible that Plaintiff's "chosen venue's choice-of-law rules will not apply."  *Vanderham*, 102 F. Supp. 3d at 1319 (alterations added; citing *Atl. Marine Constr. Co.*, 571 U.S. at 64).

"[W]hile there is some question as to whether foreign law would ultimately apply to all aspects of th[is] case[], there is no question that th[is] case[] would ensnare th[e] [C]ourt in a difficult choice of law determination."  *Proyectos Orchimex de Costa Rica, S.A. v. E.I. du Pont de Nemours & Co.*, 896 F. Supp. 1197, 1204 (M.D. Fla. 1995) (alterations added).  "The Court does not, and need not, decide which nations' laws would apply to which claims.  Such claim-by-claim analysis would defeat one of the purposes of *forum non conveniens*, which is to avoid knotty conflicts of law issues."  *Banco Santander*, 732 F. Supp. 2d at 1339; *see also Piper Aircraft Co.*,

454 U.S. at 251 ("[T]he public interest factors point towards dismissal where the court would be required to untangle problems in conflict of laws, and in law foreign to itself." (alteration added; quotation marks and citation omitted)); *Sibaja v. Dow Chem. Co.*, 757 F.2d 1215, 1218–19 (11th Cir. 1985) ("The *forum non conveniens* doctrine is 'designed in part to help courts avoid conducting complex exercises in comparative law[.]'" (alteration added; quoting *Piper Aircraft Co.*, 454 U.S. at 251)). Accordingly, "[w]ithout deciding the choice of law issue," the Court finds that the possibility that it will have to engage in a complex analysis involving conflict of laws and foreign law "weighs strongly in favor of dismissal." *Proyectos Orchimex de Costa Rica, S.A.*, 896 F. Supp. at 1204 (alteration added).

   ***Local and sovereign interests.*** Defendants contend Quebec "has a strong interest in having this dispute litigated in its courts" because the parties contracted to litigate in Quebec; the claims are governed by Quebec law; nVentive is a Quebec entity and Tanguay is a Quebec resident; and Plaintiff's principals are originally from Quebec. (Mot. 11–12). According to Defendants, "this lawsuit lacks any connection with Florida." (*Id.* 12).

   Plaintiff insists the case should remain in this District for a number of reasons: Plaintiff has its principal place of business in Miami; "[t]he operations for the services under the AB Agreement and protection under the NDNC [Agreement] w[ere] for growth here[;]" the investors and others who were the subject of Defendants' alleged circumvention and misuse of confidential information "have direct connections to Florida, transacted business with [Plaintiff] in Florida, and/or engaged in business or are regularly present in this District[;]" Plaintiff's previous app developer, who "was terminated in large part on the basis of Defendants' advisory services under the NDNC [Agreement,]" was located in Florida; and Florida law recognizes that protecting trade secrets

26

furthers the public interest.[17]  (Resp. 10 (alterations added)).

"[T]he interest of having a dispute resolved locally should be read to avoid burdening jurors or a court with cases that have no impact on their community and [should] focus on the nature of the dispute and the outcome it might have on the community." *In re Bavaria Yachts USA, LLLP*, 575 B.R. 540, 561 (Bankr. N.D. Ga. 2017) (alterations added; citation omitted).  Admittedly, Plaintiff's principal place of business is in this District, and Plaintiff indicates it suffered the alleged harm here.  (*See* Resp. 10); *see also Jiangsu Hongyuan Pharm. Co.*, 159 F. Supp. 3d at 1328 (dismissing case for *forum non conveniens* based on Chinese forum-selection clause where "the aggrieved party [wa]s a Chinese entity, and there is a local interest in having localized controversies decided at home" (alteration adopted; other alteration added; quotation marks and citation omitted)); *Belacon Pallet Servs., LLC*, 2016 WL 8999936, at *6 ("[The plaintiff] is a Florida limited liability company alleging harms that occurred to it in Florida, which Florida has a strong interest in adjudicating." (alteration added)).

In addition to this District's local interest in the case, the Court must generally consider the United States' sovereign interest.  *See Otto Candies, LLC v. Citigroup, Inc.*, 963 F.3d 1331, 1351 (11th Cir. 2020).  As Plaintiff states, "[t]here is a strong federal interest in making sure that plaintiffs[] who are United States citizens[] generally get to choose an American forum for bringing suit, rather than having their case relegated to a foreign jurisdiction.  (Pl.'s Suppl. Br. 7 (alterations added; citing *Esfeld v. Costa Crociere, S.P.A.*, 289 F.3d 1300, 1311 (11th Cir. 2002)).

Quebec, where Defendants are domiciled, also has a strong interest in litigating a dispute in which its residents allegedly made fraudulent misrepresentations and misappropriated trade

---

[17] Plaintiff also highlights Defendants' purported efforts to expand their business into South Florida (*see* Resp. 10), but those efforts have no bearing on the *forum non conveniens* analysis because they are unrelated to this dispute.

secrets, especially where Defendants aver the underlying conduct occurred in Quebec.  (*See* Tanguay Decl. ¶¶ 21, 23–26); *see Wylie*, 774 F. App'x at 580  (affirming dismissal for *forum non conveniens* where, "[i]n concluding that the public interest factors favored The Bahamas, the district court reasoned that The Bahamas has a superior interest in 'determining the standards of conduct and the scope of liability for companies that do business there" (alteration added; citation omitted)); *Sun Tr. Bank v. Sun Int'l Hotels, Ltd.*, 184 F. Supp. 2d 1246, 1266 (S.D. Fla. 2001) ("[A] defendant's home forum always has an interest in providing redress for injuries caused by its citizens." (alteration added; citation omitted)).  Moreover, "the parties contracted to litigate in [Quebec]" under the MSA, and Quebec "doubtlessly wants its citizens to be empowered to seek redress in its courts when they contract to have their claims heard there."  *Jiangsu Hongyuan Pharm. Co.*, 159 F. Supp. 3d at 1328 (alteration added).

That Defendants have filed a lawsuit against Plaintiff in Quebec arising from the parties' contractual relationship further strengthens Quebec's interest in adjudicating this case.  *See Del Istmo Assur. Corp. v. Platon*, No. 11-61599-Civ, 2011 WL 5508641, at *7 (S.D. Fla. Nov. 9, 2011) (finding Panama had a stronger interest in resolving the dispute than the United States in part because "there [wa]s already related litigation pending in Panama" (alteration added)).  Certainly, "[t]he possibility of avoiding duplicative litigation is a cognizable interest . . . which weighs in favor of dismissal."  *Nygard v. DiPaolo*, 753 F. App'x 716, 728 (11th Cir. 2018) (alterations added; citations omitted).

On balance, this factor favors dismissal.  While Florida has an interest in litigating a case involving harm to one of its residents, "[t]he otherwise substantial weight accorded to the United States' interests in providing a forum for its [p]laintiffs is undercut in the presence of a valid and enforceable forum-selection clause, and is thus outweighed by [Quebec's] interests in . . .

regulating the standards of conduct of the [Quebecois] Defendants." *Barilotti v. Island Hotel Co. Ltd.*, No. 13-23672-Civ, 2014 WL 1803374, at *10 (S.D. Fla. May 6, 2014) (alterations added). And, as discussed, the administrative-difficulties factor is not accorded much weight; Plaintiff has not shown adjudication of the case would be more efficient in Florida than in Quebec; and the real possibility of a difficult choice-of-law determination weighs strongly in favor of dismissal.

"Because th[e] [public-interest] factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." *Atl. Marine Constr. Co.*, 571 U.S. at 64 (alterations added).  In light of the MSA's valid and enforceable forum-selection clause, Plaintiff has failed to demonstrate "extraordinary circumstances" mandating the Motion be denied and the case remain in this District.  *Id.* at 62.

### 3. Plaintiff's Ability to Reinstate Its Suit in Quebec

The final consideration is whether Plaintiff can reinstate its claims in the alternative forum without undue inconvenience or prejudice.  "The burden to satisfy this requirement is not onerous." *Jiangsu Hongyuan Pharm. Co.*, 159 F. Supp. 3d at 1332 (citation omitted).  Conditions ensuring a suit can be reinstated in a different forum without undue inconvenience or prejudice "should include [the] [d]efendant's waiver of any defenses related to the statutes of limitation, venue,[] or jurisdiction" in the alternative forum.  *Barilotti*, 2014 WL 1803374, at *10 (alterations added; citation omitted).

Defendants assert Plaintiff "can reinstate its claim[s] in Quebec without undue inconvenience or prejudice[,]" given that "[a] suit is pending in Quebec for claims arising out of the App." (Mot. 12 (alterations added)).  Defendants do not indicate they will assert any defenses barring Plaintiff's suit (*see generally id.*), and Plaintiff makes no contention to the contrary (*see generally* Resp.).  This requirement is therefore satisfied.  *See Avia Support Int'l, Inc.*, 2010 WL

11505692, at *13 ("[The plaintiff] has not specifically addressed this prong of the *forum non conveniens* analysis in its papers and, therefore, it appears that it has implicitly conceded that the case may be reinstated in an alternate forum." (alteration added)).  Nevertheless, dismissal of the case is conditioned on Plaintiff's ability to reinstate its suit in Quebec, including Defendants' consent to jurisdiction and service of process in Quebec.  *See Tazoe*, 631 F.3d at 1334–35 (affirming district court's dismissal of underlying complaints on *forum non conveniens* grounds where the defendants stipulated that they would accept service of process and submit to the jurisdiction of the alternative forum); *Del Istmo Assur. Corp.*, 2011 WL 5508641, at *9 (dismissing suit for *forum non conveniens* while stating the plaintiff could reinstate its suit in this District if a foreign court refused jurisdiction, and noting "[n]umerous state and federal courts have conditioned dismissal on the ability of a party to reinstate its suit in a foreign jurisdiction" (alteration added; collecting cases)).

## IV.     CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendants' Renewed Motion to Dismiss **[ECF No. 29]** is **GRANTED** in part.  Plaintiff's Complaint **[ECF No. 1]** is **DISMISSED** without prejudice.  The Clerk of Court is directed to **CLOSE** this case, and any pending motions are **DENIED** as moot.  Should Plaintiff be unable to reinstate its suit in Quebec, the Court will reopen this action upon Plaintiff's motion.

**DONE AND ORDERED** in Miami, Florida, this 10th day of August, 2020.

_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record